**FILED & ENTERED**

JAN 13 2011

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY penning   DEPUTY CLERK

**CHANGES MADE BY COURT**

1  RON BENDER (SBN 143364)
J.P. FRITZ (SBN 245240)
2  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
3  Los Angeles, California 90067
Telephone:  (310) 229-1234
4  Facsimile:  (310) 229-1244
Email:  rb@lnbyb.com, jpf@lnbyb.com
5
Attorneys for Chapter 11 Debtors
6  and Debtors in Possession

7           **UNITED STATES BANKRUPTCY COURT**

8           **CENTRAL DISTRICT OF CALIFORNIA**

9           **RIVERSIDE DIVISION**

| | |
|---|---|
| 10 In re: | ) Lead Case No.: 6:09-bk-40532-TD |
| | ) |
| 11 CONSTRUCTION LABOR, LLC, | ) Jointly administered with: |
| | ) 6:10-bk-10877-TD |
| 12          Debtor. | ) (Construction Machine Services, LLC) and |
| | ) 6:10-bk-10880-TD |
| 13 _____ | ) (Max Equipment Rental, LLC) |
| 14 In re: | ) |
| CONSTRUCTION MACHINE SERVICES, | ) Chapter 11 Cases |
| 15 LLC, | ) |
| | ) **ORDER CONFIRMING DEBTORS'** |
| 16          Debtor. | ) **SECOND AMENDED JOINT PLAN OF** |
| | ) **REORGANIZATION (DATED** |
| 17 _____ | ) **NOVEMBER 29, 2010), AS MODIFIED** |
| In re: | ) |
| 18 | ) Hearing (Bankruptcy Judge Presiding) |
| MAX EQUIPMENT RENTAL, LLC, | ) Date: January 13, 2011 |
| 19 | ) Time: 10:00 a.m. |
| Debtor. | ) Place: 255 East Temple Street, Crtrm. 1345 |
| 20 _____ | )           Los Angeles, California, 90012 |
| | ) |
| 21 ⊠ Affects All Debtors | ) |
| | ) Hearing (Videoconference Location) |
| 22 ☐ Affects Construction Labor, LLC | ) Date: January 13, 2011 |
| | ) Time: 10:00 a.m. |
| 23 ☐ Affects Construction Machine Services, LLC | ) Place: 3420 Twelfth Street, Crtrm. 225 |
| | )           Riverside, California, 92501 |
| 24 ☐ Affects Max Equipment Rental, LLC | ) |
| 25 _____ | ) |

26

27                            -1-

28

At the above-referenced date, time, and location(s), the Honorable Thomas B. Donovan, United States Bankruptcy Judge for the Central District of California (the "Court"), held a hearing to consider the confirmation of the Debtors' Second Amended Joint Plan of Reorganization (the "Plan") filed by Construction Labor, LLC ("CL"), Construction Machine Services, LLC ("CMS"), and Max Equipment Rental, LLC ("MAX" and collectively with CL and CMS, the "Debtors"), the debtors and debtors in possession in the above-captioned, jointly administered chapter 11 bankruptcy cases.  Appearances were made as set forth on the record of the Court.

The Plan having been served upon all of the Debtors' creditors and interest holders, the Office of the United States Trustee, all parties with filed UCC statements against the Debtors, and all other parties in interest required to be served, and timely and proper notice of the hearing on Plan confirmation having been given, and the Court having read and considered the Plan, the voting on the Plan, the Debtors' Memorandum of Points and Authorities in Support of Confirmation of the Plan (the "Memorandum"), the Declaration of Mason Bailey in Support Thereof, the opposition to the Plan filed by John Deere Construction & Forestry Company, which opposition was withdrawn, any evidence and declarations in support of the foregoing duly admitted into evidence by the Court, the statements of counsel made at the Plan confirmation hearing, the entire record in these cases, the dockets in these cases, and for good cause shown,

**THIS COURT HEREBY FINDS**, as follows:

1.     The Debtors have satisfied each and every requirement of Sections 1129(a) and 1129(b) of the Bankruptcy Code necessary for this Court to confirm the Plan.

2.      The Plan complies with the provisions of Section 1129(a)(1) through Section 1129(a)(16) of the Bankruptcy Code, and, to the extent the Plan does not comply with Section 1129(a)(8) of the Bankruptcy Code with respect to Classes 6, 10, and 18, the Plan complies with the provisions of Section 1129(b)(1) and Section 1129(b)(2)(A) of the Bankruptcy Code with respect to these Classes 6, 10, and 18.

3.      The Plan shall therefore be confirmed pursuant to the provisions of Section 1129(a) and Section 1129(b) of the Bankruptcy Code as the Debtors have satisfied each and every provision of Sections 1129(a) and 1129(b) of the Bankruptcy Code.

4.      All notices required to be given or provided in connection with the Plan were given in accordance with the Bankruptcy Code and the Bankruptcy Rules and such notice was appropriate under the particular circumstances of these case s in accordance with Section 102(1)(A) of the Bankruptcy Code and otherwise.

**IT IS HEREBY ORDERED** that:

1.      The Plan, a copy of which is attached hereto as Exhibit "A," as modified by the Memorandum, is hereby confirmed pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code, subject to the terms and conditions of this Order.

2.      All terms which are not defined in this Order shall have the definitions assigned to such terms in the Plan.

3.      All terms and provisions of the Plan and this Order are hereby approved and confirmed, and binding on the Debtors, the Debtors' estate s, and any and all of the Debtors' creditors, equity security holders, entities having filed UCC statements against the Debtors, and/or any other claim and/or interest holder, including, without limitation, the holder of any claim of a kind specified in 11 U.S.C. §§ 502 and 503 whether or not:  (a) a proof of claim

based on such a debt is filed or deemed filed under 11 U.S.C. §501 or otherwise; (b) such claim

is allowed under 11 U.S.C. § 502 or otherwise; or (c) the holder of such claim has accepted the

Plan.

4.    Deere shall have an allowed secured claim in Class 2 in the amount of

$1,085,738.89 and an allowed unsecured claim in Class 20 in the amount of $45,792.27, for a

total claim in the amount of $1,131,531.16.

5.    CNH Capital will receive one payment on its Class 3 claim in January, 2011 in

the amount of $6,135.00.

6.    Regarding CFSC:

(A)    (i) CFSC shall have an allowed secured claim as of November 1, 2010,

in the amount of $87,000.00, reduced by adequate protection payments and payoffs from sales

made between November 1, 2010 and the Effective Date of the Plan; (ii) monthly payments to

CFSC under the Plan will be $1,206.00, sent to the attention of Tom Fox at CFSC; and (iii)

upon the sale, retirement or other disposition of any item of CFSC's collateral, CFSC shall

apply the payoff amount of the sold collateral as a partial satisfaction of the allowed secured

claim.  For CFSC's accounting purposes, regular monthly Plan payments shall be applied to

CFSC's allowed secured claim at CFSC's discretion; and

(B)    The Class 8 treatment to CFSC shall be as follows:

| **CLASS #** | **DESCRIPTION** | **IMPAIRED (Y/N)** | **TREATMENT** |
| --- | --- | --- | --- |
| 8 | CFSC shall have an allowed secured claim against the Debtors in the amount as listed on page 18 of the Disclosure Statement as of November 1, 2010, and reduced by any adequate | Impaired; allowed claim in this class is entitled to vote on the Plan. | Commencing on February 28, 2011, the Debtors shall repay CFSC's allowed secured claim, less any amounts identified above, and together with interest accruing on any unpaid portion thereof, over a sixty-month term, with: (i) the Debtors' making equal monthly payments in months 1 through 59 of $1,206.00 resulting in (ii) the |

| | protection payments and Payoff Amounts made before the Effective Date. | | Debtor's monthly payment in month 60 equal to the remaining balance due and owing to CFSC of $26,400 under the allowed secured claim, plus all interest accrued through the date of payoff. After March 1, 2011, interest shall accrue on any unpaid portion of the allowed secured claim at a rate of 5.0 % per annum, and, upon the sale, retirement, or other final disposition of any item of CFSC's collateral, the Debtors shall be obligated to pay CFSC the outstanding balance that remains due on that item of collateral, and CFSC shall apply that payoff amount as a partial satisfaction of the allowed secured claim, thereby reducing the payment due in month 60 under the terms of this paragraph accordingly.

In the event of a default and failure to cure after ten (10) days' written notice, CFSC shall be granted automatic relief from stay without further notice or hearing to pursue its state court remedies.

Please see Exhibit "2" for amount of projected monthly payments based on projected claim as of January 1, 2011, which accounts for adequate protection payments through December, 2010. |
|---|---|---|---|

7.    The first sentence of Section 12 of the Plan is replaced in its entirety with the following:  "The Plan Confirmation Order shall enjoin the prosecution, whether directly, derivatively or otherwise, of any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or interest against the Debtors, the Reorganized Debtor, or their

property that is released, discharged or terminated pursuant to the Plan."  Section 12 of the Plan is revised to add the following language to the end of the section: "The Plan Confirmation Order shall not enjoin creditors from enforcing personal guaranties executed in connection with any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or interest against the Debtors or the Reorganized Debtor."

8.      FMCC's Class 12 claim is modified and divided into three parts, corresponding to the three Ford vehicles that comprise its collateral, as follows:

A.   2006 Ford F150 VIN 1FTPX12576KA90723
Allowed secured claim as of Plan Effective Date: $6,765.63
Contract payment amount = $458.20
Contract interest rate = 2.9%
Contract Maturity Date = 7/6/11

B.   2006 Ford F150 VIN 1FTPX125X6FB79534
Allowed secured claim as of Plan Effective Date: $9,222.29
Contract payment amount = $441.73
Contract interest rate = 2.9%
Contract Maturity Date = 12/15/11

C.   2006 Ford F150 VIN 1FTPW14556KD89451
Allowed secured claim as of Plan Effective Date: $14,060.67
Contract payment amount = $453.57
Contract interest rate = 0.0%
Contract Maturity Date = 12/15/12

Monthly payments to Class 12 under the Plan will be modified to be $1,353.00 per month through April 2012, then $926.00 for the month of May 2012, then $895.00 per month through October 2012, then $660.00 for the month of November 2012, and $454.00 per month through August 2013.

9.      The effective date of the Plan (the "Effective Date") will be January 28, 2011, provided that all of the following conditions to the effectiveness of the Plan have been satisfied by the Debtors or waived : (a) the Court has entered an order confirming the Plan (the "Plan Confirmation Order"); (b) there shall not be any stay in effect with respect to the Plan

Confirmation Order; (c) the Plan Confirmation Order shall not be subject to any appeal or rehearing; and (d) the Plan and all documents, instruments and agreements to be executed in connection with the Plan shall have been executed and delivered by all parties to such documents, instruments and agreements.

10.    The Debtors shall be substantively consolidated as of the Effective Date.

11.    The Debtors shall be, and hereby are, authorized and empowered to execute any and all documents and take such other actions or steps as may be necessary to implement and carry out the provisions of the Plan.

12.    All of the Debtors' unexpired leases and executory contracts that are listed on the Assumption List, a copy of which is attached hereto as <u>Exhibit "B",</u> shall be deemed assumed by the Debtors as of the Effective Date.  All unexpired leases and executory contracts that are not identified on the Assumption List, and that have not been previously assumed or rejected by the Debtors, shall be deemed rejected as of the Effective Date.

13.    Any judgment at any time obtained in any other court, to the extent that such judgment is a determination of the liability of the Debtors with respect to any debt that is discharged under the Plan, is void.

14.    The commencement or continuation of any action, the employment of process, or any act to collect, recover, or offset any debts and/or claims against the Debtors and/or the Debtors' estates that is discharged under the Plan is hereby forever enjoined.

15.    All claims against or assertions of interest in the Debtors and/or the Debtors' estates not filed on or before the applicable bar date set by this Court, or not otherwise allowed in accordance with the Bankruptcy Code and Bankruptcy Rules, shall be forever barred whether such claims or interests arose before or after the Debtors' petition filing dates, except the

allowed fees and expenses of professionals employed in the Debtors' Chapter 11 bankruptcy cases.

16.    Claim holders shall not receive any distribution from the Debtors or the Reorganized Debtor other than as specifically set forth in the Plan.

17.    On the Effective Date, all property of the Debtors' estates shall revest in the Reorganized Debtor.

18.    Except as provided in the Plan, the property of the Debtors revested in the Reorganized Debtor shall be free and clear of all claims and interests of creditors.

19.    Pursuant to 11 U.S.C. §1141(d)(1), but subject to 11 U.S.C. §1141(d)(6), the confirmation of the Plan shall discharge the Debtors from any debt that arose before the date of such confirmation and any debt of a kind specified in 11 U.S.C. §§502(g), 502(h) or 502(i).

20.    Any conflict between the terms of this Order and the Plan shall be resolved in favor of this Order.

21.    This case is set for a post confirmation status conference on June 9, 2011 at 10:00 a.m.  The reorganized debtor is instructed to file a status conference report not later than May 26, 2011 and prior to every subsequent status conference herein.

**IT IS SO ORDERED.**

# # #

DATED: January 13, 2011

_____
United States Bankruptcy Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**EXHIBIT "A"**

27

28

RON BENDER (SBN 143364)
J.P. FRITZ (SBN 245240)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com, jpf@lnbyb.com

Attorneys for Chapter 11 Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**RIVERSIDE DIVISION**

| | |
|---|---|
| In re: | ) Lead Case No.: 6:09-bk-40532-TD |
| | ) |
| CONSTRUCTION LABOR, LLC, | ) Jointly administered with: |
| | ) 6:10-bk-10877-TD |
| Debtor. | ) (Construction Machine Services, LLC) and |
| | ) 6:10-bk-10880-TD |
| In re: | ) (Max Equipment Rental, LLC) |
| | ) |
| CONSTRUCTION MACHINE SERVICES, LLC, | ) Chapter 11 Cases |
| | ) |
| | ) **DEBTORS' SECOND AMENDED** |
| Debtor. | ) **JOINT PLAN OF REORGANIZATION** |
| | ) **(DATED NOVEMBER 29, 2010) AS** |
| | ) **MODIFIED AT THE HEARING TO** |
| In re: | ) **CONFIRM THE PLAN ON JANUARY** |
| | ) **13, 2011** |
| MAX EQUIPMENT RENTAL, LLC, | ) |
| | ) Plan Confirmation Hearing: |
| Debtor. | ) Date: January 13, 2011 |
| | ) Time: 10:00 a.m. |
| ☒ Affects All Debtors | ) |
| | ) Hearing (Bankruptcy Judge Presiding) |
| ☐ Affects Construction Labor, LLC | ) Place: 255 East Temple Street, Crtrm. 1345 |
| | ) Los Angeles, California, 90012 |
| ☐ Affects Construction Machine Services, LLC | ) |
| | ) Hearing (Videoconference Location) |
| ☐ Affects Max Equipment Rental, LLC | ) Place: 3420 Twelfth Street, Crtrm. 225 |
| | ) Riverside, California, 92501 |
| | ) |
| | ) |
| | ) |
| | ) |

# I.

# INTRODUCTION

Construction Labor, LLC ("CL"), Construction Machine Services, LLC ("CMS"), and Max Equipment Rental, LLC ("MAX" and collectively with CL and CMS, the "Debtors"), the debtors and debtors in possession in the above-captioned, jointly-administered, chapter 11 bankruptcy cases, are the Debtors in pending chapter 11 bankruptcy cases. On December 16, 2009 (the "CL Petition Date"), CL filed its voluntary petition, case number 6:09-bk-40532-TD, under chapter 11 of title 11 sections 101 *et seq.* of the United States Code (the "Bankruptcy Code"). On January 12, 2010 (the "Petition Date"), both CMS and MAX filed their voluntary petitions, case numbers 6:10-bk-10877-TD and 6:10-bk-10880-TD, respectively, under chapter 11 of the Bankruptcy Code. Subsequently, the Court entered an order jointly administering the three cases under CL's bankruptcy case, number, and docket. The Debtors continue to operate their collective business, manage their financial affairs and operate their bankruptcy estates as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. One Official Committee of Unsecured Creditors (the "Committee") has been formed in the CMS bankruptcy case to represent the interests of the unsecured creditors in the CMS bankruptcy case. This document is the Disclosure Statement, which describes the Debtors' joint plan of reorganization (the "Plan").

Chapter 11 allows the Debtors, and, under some circumstances, creditors and other parties in interest, to propose a plan of reorganization. The Plan is a joint plan of reorganization which has been jointly proposed by the Debtors. The effective date of the Plan (the "Effective Date") will be January 28, 2011, provided that all of the following conditions to the effectiveness of the Plan have been satisfied by the Debtors or waived: (a) the Court has entered

an order confirming the Plan (the "Plan Confirmation Order"); (b) there shall not be any stay in effect with respect to the Plan Confirmation Order; (c) the Plan Confirmation Order shall not be subject to any appeal or rehearing; and (d) the Plan and all documents, instruments and agreements to be executed in connection with the Plan shall have been executed and delivered by all parties to such documents, instruments and agreements.

## II.

## PLAN SUMMARY

On the Plan Effective Date, CL and MAX will be deemed substantively consolidated with CMS, with the post-confirmation substantively consolidated entity to be referred to herein as the "Reorganized Debtor." The Reorganized Debtor will acquire all assets and assume all liabilities of CL, CMS, and MAX, as restructured under the Plan. The Reorganized Debtor will sign any reasonable documentation as requested by creditors or required by law to effectuate the acquisition of assets and assumption of liabilities under the Plan. CL and MAX will be deemed dissolved by and through an order of this Court confirming the Plan. Additionally, the Debtors will take appropriate steps in accordance with the California Corporate Code and applicable non-bankruptcy law to dissolve CL and MAX, such as filing Limited Liability Company Certificate of Cancellation Form LLC 4/7 with the State of California Secretary of State within ten (10) business days of the Plan Effective Date, thereby leaving CMS as the surviving Reorganized Debtor with all assets and liabilities of the three Debtors under the confirmed Plan.

Bailey and McDaris will make a total capital contribution of $50,000.00[1] to the Debtors to assist the Reorganized Debtor to pay the outstanding professional fees and expenses owing by the Debtors, which must be paid in order for the Debtors to confirm the Plan. These capital contributions from Bailey and McDaris are collectively defined herein as the "New Value

---

[1] The amount of this capital contribution may need to be adjusted due to circumstances which arise in these cases but this figure is the Debtors' current estimate of the amount needed.

Contribution."  Bailey will retain his 80% equity ownership interest in the Reorganized Debtor, and McDaris will retain his 20% equity ownership interest in the Reorganized Debtor.

The class 1 claim under the Plan is comprised of WFEFI's allowed secured claim.

The class 2 claim under the Plan is comprised of Deere's allowed secured claim.

The class 3 claim under the Plan is comprised of CNH Capital's allowed secured claim.

The class 4 claim under the Plan is comprised of GECDF's allowed secured claim.

The class 5 claim under the Plan is comprised of GECC's allowed secured claim.

The class 6 claim under the Plan is comprised of Textron's allowed secured claim.

The class 7 claim under the Plan is comprised of Bello's allowed secured claim.

The class 8 claim under the Plan is comprised of CFSC's allowed secured claim.

The class 9 claim under the Plan is comprised of Town & Country Leasing LLC's allowed secured claim.

The class 10 claim under the Plan is comprised of BOA's allowed secured claim.

The class 11 claim under the Plan is comprised of Balboa Capital's allowed secured claim.

The class 12 claim under the Plan is comprised of FMCC's allowed secured claim.

The class 13 claim under the Plan is comprised of Chrysler's allowed secured claim.

The class 14 claim under the Plan is comprised of Toyota's allowed secured claim.

The class 15 claim under the Plan is comprised of Double JM's allowed secured claim.

The class 16 claim under the Plan is comprised of Runway Holdings' allowed secured claim.

The class 17 claim under the Plan is comprised of McDaris' allowed secured claim.

Class 18 claim holders are comprised of any other allowed secured claims other than the secured claims contained in class 1 through class 17 in the Plan.  The Debtors believe that there are no class 18 claims, much less allowed class 18 claims.  If there are any holders of class 18

allowed claims, they will be treated in a manner consistent with the provisions of Section 1129(b)(2)(A)(iii) of the Bankruptcy Code and realize the indubitable equivalent of their claims.

Certain parties filed UCC-1 statements against the Debtors with the California Secretary of State, and the Debtors believe that the rights and interests represented in these UCC-1 filings have been assigned to members of classes 1 through 18. These parties are: Carlbadav; Citi Capital Commercial Corp.; Citicorp. Leasing, Inc.; Deere Credit Inc.; Ingersoll Rand; JLG Industries, Inc.; RDO Equipment Co.; TFS Capital Funding; The CIT Equipment Group; and Volvo Road Machinery, Inc. Additionally, the Debtors deem that Colonial Pacific Leasing Corporation, which is a party to the GECC Litigation and asserts to be a successor-in-interest to Citicapital Commercial Corp., has no valid secured claim against any of the Debtors, and, to the extent that it has any valid claim, that claim is subsumed in GECC's claim and treated therein. Furthermore, VFS's claims and interests against the Debtors and in the Debtors' estates were released and waived by stipulation and order of this Court on June 30, 2010. The Plan will eliminate these parties' secured interests in any and all assets, machinery, equipment, accounts, and proceeds of the Debtors or Reorganized Debtor, and these parties will be forever barred from asserting any action or process against the Debtors or Reorganized Debtor for collection of debt arising before the Plan Effective Date. The Debtors dispute that any of these parties have a claim. These parties are not placed in any class, and they may not vote on the Plan. However, they may object to the confirmation of the Plan.

Class 19 claim holders are comprised of any non-tax priority claims under the Plan. There are three (3) scheduled non-tax priority claims for priority wages on MAX's schedules and proofs of claims. They will be paid in cash in full on the Plan Effective Date.

Class 20 claim holders are comprised of all general unsecured creditors of the Debtors. Each holder of a class 20 allowed claim will receive in full settlement and satisfaction of its class 20 allowed claim a cash payment on June 30, 2011 equal to 7.5% of the amount of its class

20 allowed claim and then a second cash payment on September 30, 2011 equal to 7.5% of the amount of its class 20 allowed claim, for a total payment of 15% of its class 20 allowed claim. The Debtors propose to defer payment to class 20 to quarter 2 and quarter 3 of 2011 because quarter 1 is traditionally the slowest quarter in the construction industry in Southern California due to incremental weather and construction budgets.  Upon confirmation of this Plan and on the Plan Effective Date, the Debtors waive and release their intercompany, general, unsecured claims against one another.

The class 21 interest holder (Bailey) will retain his 80% equity ownership interest in the Reorganized Debtor.

The class 22 interest holder (McDaris) will retain his 20% equity ownership interest in the Reorganized Debtor.

## III.

### CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

a.    **What Creditors and Interest Holders Will Receive Under the Plan**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority.  The Plan states whether each class of claims or interests is impaired or unimpaired.  The Plan provides the treatment each class will receive.

b.    **Unclassified Claims**

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Debtors have <u>not</u> placed the following claims in a class.

(i)  Administrative Expenses

Administrative expenses are claims for costs or expenses of administering the Debtors'

chapter 11 cases which are allowed under Bankruptcy Code Section 507(a)(2). The Bankruptcy

Code requires that all administrative claims be paid on the Plan Effective Date unless a

particular claimant agrees to a different treatment.

The following chart lists all of the Debtors' § 507(a)(2) administrative claims and their

treatment under the Plan.[2]

| Name | Amount Owed | Treatment |
|------|-------------|-----------|
| Clerk's Office Fees | $0 | Paid in full on the Effective Date |
| Office of the U.S. Trustee Fees | $0 | Paid in full on the Effective Date |
| Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB"), bankruptcy counsel to the Debtors | $160,000 (est.), which would be in addition to the  payments expected to be paid by the Debtors to LNBYB prior to the Effective Date, and LNBYB's retainer balance remaining on the Petition Date | Paid in full out of the Debtors' cash on hand on the later of the Effective Date and the date the Court enters an order allowing such fees and expenses |
| Brinkman Portillo Ronk, PC ("BPR"), bankruptcy counsel to the Committee | $10,000 (est.), which would be in addition to the $8,601.58 post-petition payments paid by the Debtors to BPR prior to the Effective Date | Paid in full out of the Debtors' cash on hand on the later of the Effective Date and the date the Court enters an order allowing such fees and expenses |
| Walters, Townsend & Schaelen, APLC, ("WTS") special collections counsel to CMS | $10,000 (est.), which would be in addition to the $20,431.32 post-petition payments paid by the Debtors to WTS prior to the Effective Date | Paid in full out of the Debtors' cash on hand on the later of the Effective Date and the date the Court enters an order allowing such fees and expenses |
| EquipOne Ventures LLC ("EquipOne"), financial consultant to the Debtors | $0 | EquipOne's fees and expenses were paid by Court approval and order. |

[2] The professionals who have been employed in these cases have not been billing CL, CMS, and MAX separately.  The fees and expense figures set forth below are the total fees and expenses figures for these professionals for their representation involving the CL, CMS, and MAX bankruptcy estates.

| | | |
|---|---|---|
| Post-Petition Non-Professional Fee Administrative Claims | $0.00 (approx.) of post-petition accounts payable accrued in the ordinary course of the Debtors' business | Paid in full out of the Reorganized Debtor' funds in the ordinary course of the Reorganized Debtor' business or following the entry of an order of the Court if a dispute exists between the Reorganized Debtor and the administrative claim holder |
| **TOTAL** | $180,000 est. | Paid in the manner described above |

Court Approval of Fees Required:

The Court must approve all professional fees and expenses listed in this chart before they may be paid. For all professional fees and expenses except fees owing to the Clerk of the Bankruptcy Court and fees owing to the OUST, the professional in question must file and serve a properly noticed fee application and the Court must rule on the application. Only the amount of fees and expenses allowed by the Court will be required to be paid under the Plan. The administrative claim amounts set forth above simply represent the Debtors' best estimates as to the amount of allowed administrative claims in these cases. The actual administrative claims may be higher or lower. Much of whether the actual administrative claims described above for professionals will be dependent upon whether the Debtors are required to engage in any substantial litigation regarding the confirmation of the Plan and/or objecting to claims. To the extent the Debtors are required to engage in any such substantial litigation, the Debtors' professionals are likely to incur professional fees and expenses in excess (and possibly substantially in excess) of the figures set forth above. By voting to accept the Plan, creditors are not acknowledging the validity of, or consenting to the amount of, any of these administrative

claims, and creditors are not waiving any of their rights to object to the allowance of any of these administrative claims. By including the figures described above, the Debtors are not acknowledging the validity of, or consenting to the amount of, any of these administrative claims, and the Debtors are not waiving any of their rights to object to the allowance of any of these administrative claims. Similarly, professionals who have been employed in these cases are not being deemed to have agreed that the figures contained herein represent any ceiling on the amount of fees and expenses that they have incurred or are entitled to seek to be paid pursuant to Court order as such fees and expenses are just estimates provided at the time of the preparation of this Disclosure Statement.

To the extent allowed administrative claims are allowed prior to the Effective Date, such allowed administrative claims may be paid by the Debtors out of the Debtors' funds to the extent the Debtors have sufficient funds to pay them. To the extent allowed administrative claims are allowed after the Effective Date, such allowed administrative claims will be paid by the Reorganized Debtor out of the New Value Contribution with any balance to be paid out of the Reorganized Debtor's operating funds.

(ii) Priority Tax Claims

Priority tax claims include certain unsecured income, employment and other taxes described by Section 507(a)(8) of the Bankruptcy Code. Section 1129(a)(9)(C) of the Bankruptcy Code requires that each holder of such a Section 507(a)(8) priority tax claim receive regular installment payments of a total value, as of the Plan Effective Date, equal to the allowed amount of such allowed tax claims, over a period ending not later than five years after the Petition Date. All allowed Section 507(a)(8) priority tax claims will be paid the full amount of such claims over fifteen (15) calendar quarters with the first payment to be made on January 1, 2011, and ending on September 30, 2014, in equal quarterly payments with interest to accrue from the Plan Effective Date at the rate of 10% per annum, pursuant to *California Revenue and*

*Taxation Code* § 2922.  A failure by the Debtors to make a payment on the priority tax claims pursuant to the terms of the Plan will be an event of default.  If the event of default is not cured within fifteen (15) business days after service of written notice of default from the taxing authority, then the taxing authority may enforce its applicable remedies, with jurisdiction maintained by the Bankruptcy Court.  The chart below indicates all priority tax claims which were either scheduled by the Debtors or asserted by the taxing agencies in filed proofs of claim. The inclusion of the claims in the chart below is intended simply to reflect the claims that have been scheduled and/or asserted in filed proofs of claim as priority tax claims, and is not intended to be a concession by the Debtors regarding the validity of such claims or the classification of such claims as priority tax claims under Section 507(a)(8) of the Bankruptcy Code.

| Claimant | Claim No. | Debtor | Claim Amount |
|---|---|---|---|
| **Riverside County** | **Scheduled** | **CL** | **$24,005.09** |
| **San Diego County** | **Scheduled** | **CMS** | **$36,624.83** |

c.     **Classified Claims and Interests**

    (i)  Classes of Secured Claims

Secured claims are claims secured by liens on property of the estates.  The following charts set forth the description and treatment of each of the Debtors' secured claims.

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 1 | WFEFI shall have an allowed secured claim against the Debtors in the amount as listed on page 18 of this Disclosure Statement as of November 1, 2010, and reduced by any adequate protection | Impaired; allowed claim in this class is entitled to vote on the Plan. | On January 31, 2011, accrued interest for the month of January, 2011 will be paid by the Debtor to WFEFI.<br><br>Commencing on February 28, 2011 and on the last calendar day of each month thereafter until and including July 31, 2012, the Debtor shall pay WFEFI monthly installments of principal and |

| | | | |
|---|---|---|---|
| payments and Payoff Amounts made before the Effective Date. | | | interest in amount of $28,000. |

Commencing on August 31, 2012 and on the last calendar day of each month thereafter until and including January 31, 2013, the Debtor shall pay WFEFI monthly installments of principal and interest in amount of $34,500.00.

Commencing on February 28, 2014 and on the last calendar day of each month thereafter until and including January 31, 2016, the Debtor shall pay WFEFI monthly installments of principal and interest in amount of $50,000.

On February 29, 2016 (the "Balloon Payment Date"), the Debtor shall pay WFEFI any balance owing, all accrued and unpaid interest, charges, fees and costs.   Not less than 120 days prior to the Balloon Payment Date, the Debtor shall request in writing a full and final accounting of any and all amounts still due and owing to WFEFI.  WFEFI shall provide the accounting to the Debtor not later than 25 days prior to the Balloon Payment Date.

In consideration of WFEFI's agreement to reduce to the principal amount owed by the Debtor under the Prior Documentation, the Debtor agrees to make a $30,000 payment to WFEFI on March 31, 2016 (the "Supplemental Payment").  WFEFI agrees to waive the Debtor's obligation to make the Supplemental Payment if all payments due and owing under the terms of this Agreement have been made on or prior to their

|  |  |  | scheduled due date, or if the principal is prepaid in full and all previous payments due and owing under the terms of this Agreement have been made on or prior to their scheduled due date.

WFEFI will receive interest on the unpaid balance hereof at the rate of 5.00% per annum (computed on the basis of a year of twelve 30-day months).

Please see Addendum "W" for documentation of agreement between Debtors and WFEFI on WFEFI's full treatment.

Please see Exhibit "2" for amount of projected monthly payments based on projected claim as of January 1, 2011, which accounts for adequate protection payments through December 2010. |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 2 | Deere shall have an allowed secured claim against the Debtors in the amount as listed on page 18 of this Disclosure Statement as of November 1, 2010, and reduced by any adequate protection payments and Payoff Amounts made before the Effective Date. | Impaired; allowed claim in this class is entitled to vote on the Plan. | Commencing on February 28, 2011, the Debtors shall repay Deere's allowed secured claim, less any amounts identified above, and together with interest accruing on any unpaid portion thereof, over a sixty-month term, with: (i) the Debtors' monthly principal and interest payments in months 1 through 59 calculated on a 108-month amortization schedule and (ii) the Debtors' monthly payment in month 60 equal to the remaining balance due and owing to Deere under the allowed secured claim, plus all interest accrued through the date of payoff. After March 1, 2011, |

interest shall accrue on any unpaid portion of the allowed secured claim at a rate of 5.0 % per annum, and, upon the sale, retirement, or other final disposition of any item of Deere's collateral, the Debtors shall be obligated to pay Deere the outstanding balance that remains due on that item of collateral, and Deere shall apply that payoff amount as a partial satisfaction of the allowed secured claim, thereby reducing the monthly payments due under the terms of this paragraph accordingly.

Please see Exhibit "2" for amount of projected monthly payments based on projected claim as of January 1, 2011, which accounts for adequate protection payments through December 2010.

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 3 | CNH Capital shall have an allowed secured claim against the Debtors in the amount as listed on page 18 of this Disclosure Statement as of November 1, 2010, and reduced by any adequate protection payments and Payoff Amounts made before the Effective Date. | Impaired; allowed claim in this class is entitled to vote on the Plan. | Commencing on February 28, 2011, the Debtors shall repay CNH Capital's allowed secured claim, less any amounts identified above, and together with interest accruing on any unpaid portion thereof, over a sixty-month term, with: (i) the Debtors' monthly principal and interest payments in months 1 through 59 calculated on a 108-month amortization schedule and (ii) the Debtors' monthly payment in month 60 equal to the remaining balance due and owing to CNH Capital under the allowed secured claim, plus all interest accrued through the date of payoff. After March 1, |

2011, interest shall accrue on any unpaid portion of the allowed secured claim at a rate of 5.0 % per annum, and, upon the sale, retirement, or other final disposition of any item of CNH Capital's collateral, the Debtors shall be obligated to pay CNH Capital the outstanding balance that remains due on that item of collateral, and CNH Capital shall apply that payoff amount as a partial satisfaction of the allowed secured claim, thereby reducing the monthly payments due under the terms of this paragraph accordingly.

Please see Exhibit "2" for amount of projected monthly payments based on projected claim as of January 1, 2011, which accounts for adequate protection payments through December 2010.

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
| --- | --- | --- | --- |
| 4 | GECDF shall have an allowed secured claim against the Debtors in the amount as listed on page 18 of this Disclosure Statement as of November 1, 2010, and reduced by any adequate protection payments and Payoff Amounts made before the Effective Date. | Impaired; allowed claim in this class is entitled to vote on the Plan. | Commencing on the Effective Date, the Debtors shall repay GECDF's allowed secured claim, with interest accruing on any unpaid portion thereof, over a sixty-month term, with: (i) the Debtors' monthly payments in months 1 through 59 equal to .926 % of the allowed secured claim, plus all interest accrued through the date of payment; and (ii) the Debtor's monthly payment in month 60 equal to the remaining balance due and owing to GECDF under the allowed secured claim, plus all interest accrued through the date of payoff. On January 1, 2011, interest shall accrue on any |

| | | | unpaid portion of the allowed secured claim at a rate of 5.0 % per annum, and upon the sale, retirement, or other final disposition of any item of Collateral, the Debtors shall be obligated to pay GECDF the outstanding balance that remains due on that item of collateral, and GECDF shall apply the Payoff Amount as a partial satisfaction of the allowed secured claim, thereby reducing the monthly payments due.<br><br>Please see Exhibit "2" for amount of projected monthly payments based on projected claim as of January 1, 2011, which accounts for adequate protection payments through December 2010. |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 5 | GECC shall have an allowed secured claim against the Debtors in the amount as listed on page 18 of this Disclosure Statement as of November 1, 2010, and reduced by any adequate protection payments and Payoff Amounts made before the Effective Date. | Impaired; allowed claim in this class is entitled to vote on the Plan. | Commencing on the Effective Date, the Debtors shall repay the GECC's allowed secured claim, with interest accruing on any unpaid portion thereof, over a sixty-month term, with: (i) the Debtors' monthly payments in months 1 through 59 equal to .926 % of the allowed secured claim, plus all interest accrued through the date of payment; and (ii) the Debtor's monthly payment in month 60 equal to the remaining balance due and owing to GECC under the allowed secured claim, plus all interest accrued through the date of payoff. On, January 1, 2011, interest shall accrue on any unpaid portion of the allowed secured claim at a rate of 5.0% per annum, and upon the sale, retirement, or other final |

| | | | disposition of any time of Collateral, the Debtors shall be obligated to pay GECC the outstanding balance that remains due on that item of collateral, and GECC shall apply the Payoff Amount as a partial satisfaction of the allowed secured claim, thereby reducing the monthly payments due.<br><br>Please see Exhibit "2" for amount of projected monthly payments based on projected claim as of January 1, 2011, which accounts for adequate protection payments through December 2010. |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 6 | Textron shall have an allowed secured claim against the Debtors in the amount as listed on page 18 of this Disclosure Statement as of November 1, 2010, and reduced by any adequate protection payments and Payoff Amounts made before the Effective Date. | Impaired; allowed claim in this class is entitled to vote on the Plan. | Commencing on February 28, 2011, the Debtors shall repay Textron's allowed secured claim, less any amounts identified above, and together with interest accruing on any unpaid portion thereof, over a sixty-month term, with: (i) the Debtors' monthly principal and interest payments in months 1 through 59 calculated on a 98-month amortization schedule and (ii) the Debtors' monthly payment in month 60 equal to the remaining balance due and owing to Textron under the allowed secured claim, plus all interest accrued through the date of payoff.  After March 1, 2011, interest shall accrue on any unpaid portion of the allowed secured claim at a rate of 5.0 % per annum, and, upon the sale, retirement, or other final disposition of any item of Textron's collateral, the Debtors |

shall be obligated to pay Textron the outstanding balance that remains due on that item of collateral, and Textron shall apply that payoff amount as a partial satisfaction of the allowed secured claim, thereby reducing the monthly payments due under the terms of this paragraph accordingly.

In the event of default and failure to cure within ten (10) business days from notice by Textron to the Debtors by reliable overnight courier, the Debtors shall turnover Textron's collateral to Textron.

Please see Exhibit "2" for amount of projected monthly payments based on projected claim as of January 1, 2011, which accounts for adequate protection payments through December 2010.

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 7 | Bello shall have an allowed secured claim against the Debtors in the amount as listed on page 18 of this Disclosure Statement as of November 1, 2010, and reduced by any adequate protection payments and Payoff Amounts made before the Effective Date. | Impaired; allowed claim in this class is entitled to vote on the Plan. | Commencing on February 28, 2011, the Debtors shall repay Bello's allowed secured claim, less any amounts identified above, and together with interest accruing on any unpaid portion thereof, over a sixty-month term, with: (i) the Debtors' monthly principal and interest payments in months 1 through 59 calculated on a 108-month amortization schedule and (ii) the Debtors' monthly payment in month 60 equal to the remaining balance due and owing to Bello under the allowed secured claim, plus all interest accrued through the date of payoff. After March 1, 2011, interest shall accrue on any unpaid portion of |

| | | | the allowed secured claim at a rate of 5.0 % per annum, and, upon the sale, retirement, or other final disposition of any item of Bello's collateral, the Debtors shall be obligated to pay Bello the outstanding balance that remains due on that item of collateral, and Bello shall apply that payoff amount as a partial satisfaction of the allowed secured claim, thereby reducing the monthly payments due under the terms of this paragraph accordingly.. Please see Exhibit "2" for amount of projected monthly payments based on projected claim as of January 1, 2011, which accounts for adequate protection payments through December 2010. |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 8 | CFSC shall have an allowed secured claim against the Debtors in the amount as listed on page 18 of this Disclosure Statement as of November 1, 2010, and reduced by any adequate protection payments and Payoff Amounts made before the Effective Date. | Impaired; allowed claim in this class is entitled to vote on the Plan. | Commencing on February 28, 2011, the Debtors shall repay CFSC's allowed secured claim, less any amounts identified above, and together with interest accruing on any unpaid portion thereof, over a sixty-month term, with: (i) the Debtors' making equal monthly payments in months 1 through 59 of $1,206.00 resulting in (ii) the Debtor's monthly payment in month 60 equal to the remaining balance due and owing to CFSC of $26,400 under the allowed secured claim, plus all interest accrued through the date of payoff. After March 1, 2011, interest shall accrue on any unpaid portion of the allowed secured claim at a rate of 5.0 % per annum, and, upon the sale, |

| | | | retirement, or other final disposition of any item of CFSC's collateral, the Debtors shall be obligated to pay CFSC the outstanding balance that remains due on that item of collateral, and CFSC shall apply that payoff amount as a partial satisfaction of the allowed secured claim, thereby reducing the payment due in month 60 under the terms of this paragraph accordingly.<br><br>In the event of a default and failure to cure after ten (10) days' written notice, CFSC shall be granted automatic relief from stay without further notice or hearing to pursue its state court remedies.<br><br>Please see Exhibit "2" for amount of projected monthly payments based on projected claim as of January 1, 2011, which accounts for adequate protection payments through December 2010. |
|---|---|---|---|

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 9 | Town & Country shall have an allowed secured claim against the Debtors in the amount as listed on page 18 of this Disclosure Statement as of November 1, 2010, and reduced by any adequate protection payments and Payoff Amounts made before the Effective Date. | Impaired; allowed claim in this class is entitled to vote on the Plan. | Commencing on February 28, 2011, the Debtors shall repay Town & Country's allowed secured claim, less any amounts identified above, and together with interest accruing on any unpaid portion thereof, over a sixty-month term, with: (i) the Debtors' monthly principal and interest payments in months 1 through 59 calculated on a 108-month amortization schedule and (ii) the Debtors' monthly payment in month 60 equal to the remaining balance due and owing to Town & Country under the |

| | | | allowed secured claim, plus all interest accrued through the date of payoff. After March 1, 2011, interest shall accrue on any unpaid portion of the allowed secured claim at a rate of 5.0 % per annum, and, upon the sale, retirement, or other final disposition of any item of Town & Country's collateral, the Debtors shall be obligated to pay Town & Country the outstanding balance that remains due on that item of collateral, and Town & Country shall apply that payoff amount as a partial satisfaction of the allowed secured claim, thereby reducing the monthly payments due under the terms of this paragraph accordingly.<br><br>Please see Exhibit "2" for amount of projected monthly payments based on projected claim as of January 1, 2011, which accounts for adequate protection payments through December 2010. |
|---|---|---|---|

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 10 | BOA shall have an allowed secured claim against the Debtors in the amount as listed on page 18 of this Disclosure Statement as of November 1, 2010, and reduced by any adequate protection payments and Payoff Amounts made before the Effective Date. | Impaired; allowed claim in this class is entitled to vote on the Plan. | Commencing on February 28, 2011, the Debtors shall repay BOA's allowed secured claim, less any amounts identified above, and together with interest accruing on any unpaid portion thereof, over a sixty-month term, with: (i) the Debtors' monthly principal and interest payments in months 1 through 59 calculated on a 108-month amortization schedule and (ii) the Debtors' monthly payment in month 60 equal to the remaining balance due and owing to BOA under the allowed secured claim, plus all interest accrued |

-29-

through the date of payoff. After March 1, 2011, interest shall accrue on any unpaid portion of the allowed secured claim at a rate of 5.0 % per annum, and, upon the sale, retirement, or other final disposition of any item of BOA's collateral, the Debtors shall be obligated to pay BOA the outstanding balance that remains due on that item of collateral, and BOA shall apply that payoff amount as a partial satisfaction of the allowed secured claim, thereby reducing the monthly payments due under the terms of this paragraph accordingly.

Please see Exhibit "2" for amount of projected monthly payments based on projected claim as of January 1, 2011, which accounts for adequate protection payments through December 2010.

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| 11 | Balboa Capital shall have an allowed secured claim in the amount of $0.00 against the Debtors. | Not Impaired; allowed claim in this class is not entitled to vote on the Plan. | Balboa Capital will receive nothing under the Plan because its collateral was sold pursuant to notice and sale procedures approved by the court, [docket entry no. 119] on November 2, 2010, the proceeds of which repaid Balboa Capital in full. |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| 12 | FMCC shall have an allowed secured claim against the Debtors in the | Impaired; allowed claim in this | Commencing on February 28, 2011, FMCC will receive the interest and principal payments in amounts in accordance with the |

| | | | |
|---|---|---|---|
| | amount as listed on page 18 of this Disclosure Statement as of November 1, 2010, and reduced by any adequate protection payments and Payoff Amounts made before the Effective Date. | class is entitled to vote on the Plan. | prepetition agreement between FMCC and the Debtors until paid in full.<br><br>Please see Exhibit "2" for amount of projected monthly payments based on projected claim as of January 1, 2011, which accounts for adequate protection payments through December 2010. |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 13 | Chrysler shall have an allowed secured claim against the Debtors in the amount as listed on page 18 of this Disclosure Statement as of November 1, 2010, and reduced by any adequate protection payments and Payoff Amounts made before the Effective Date. | Impaired; allowed claim in this class is entitled to vote on the Plan. | Commencing on February 28, 2011, Chrysler will receive the interest and principal payments in amounts in accordance with the prepetition agreement between Chrysler and the Debtors until paid in full.<br><br>Please see Exhibit "2" for amount of projected monthly payments based on projected claim as of January 1, 2011, which accounts for adequate protection payments through December 2010. |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 14 | Toyota shall have an allowed secured claim against the Debtors in the amount as listed on page 18 of this Disclosure Statement as of November 1, 2010, and reduced by any adequate protection | Impaired; allowed claim in this class is entitled to vote on the Plan. | Commencing on February 28, 2011, Toyota will receive the interest and principal payments in amounts in accordance with the prepetition agreement between Toyota and the Debtors until paid in full.<br><br>Please see Exhibit "2" for amount of projected monthly payments based on projected claim as of |

| | | | |
|---|---|---|---|
| | payments and Payoff Amounts made before the Effective Date. | | January 1, 2011, which accounts for adequate protection payments through December 2010. |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 15 | Double JM shall have an allowed secured claim against the Debtors in the amount as listed on page 18 of this Disclosure Statement as of November 1, 2010, and reduced by any adequate protection payments and Payoff Amounts made before the Effective Date. | Impaired; allowed claim in this class is entitled to vote on the Plan. | Commencing on February 28, 2011, the Debtors shall repay Double JM's allowed secured claim, less any amounts identified above, and together with interest accruing on any unpaid portion thereof, over a sixty-month term, with: (i) the Debtors' monthly principal and interest payments in months 1 through 59 calculated on a 108-month amortization schedule and (ii) the Debtors' monthly payment in month 60 equal to the remaining balance due and owing to Double JM under the allowed secured claim, plus all interest accrued through the date of payoff. After March 1, 2011, interest shall accrue on any unpaid portion of the allowed secured claim at a rate of 5.0 % per annum, and, upon the sale, retirement, or other final disposition of any item of Double JM's collateral, the Debtors shall be obligated to pay Double JM the outstanding balance that remains due on that item of collateral, and Double JM shall apply that payoff amount as a partial satisfaction of the allowed secured claim, thereby reducing the monthly payments due under the terms of this paragraph accordingly..  Please see Exhibit "2" for amount of projected monthly payments based on projected claim as of January 1, 2011, which accounts |

| | | | for adequate protection payments through December 2010. |
| --- | --- | --- | --- |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
| --- | --- | --- | --- |
| 16 | Runway Holdings shall have an allowed secured claim against the Debtors in the amount as listed on page 18 of this Disclosure Statement as of November 1, 2010, and reduced by any adequate protection payments and Payoff Amounts made before the Effective Date. | Impaired; allowed claim in this class is entitled to vote on the Plan. | Commencing on February 28, 2011, the Debtors shall repay Runway Holdings' allowed secured claim, less any amounts identified above, and together with interest accruing on any unpaid portion thereof, over a sixty-month term, with: (i) the Debtors' monthly principal and interest payments in months 1 through 59 calculated on a 108-month amortization schedule and (ii) the Debtors' monthly payment in month 60 equal to the remaining balance due and owing to Runway Holdings under the allowed secured claim, plus all interest accrued through the date of payoff.  After March 1, 2011, interest shall accrue on any unpaid portion of the allowed secured claim at a rate of 5.0 % per annum, and, upon the sale, retirement, or other final disposition of any item of Runway Holdings' collateral, the Debtors shall be obligated to pay Runway Holdings the outstanding balance that remains due on that item of collateral, and Runway Holdings shall apply that payoff amount as a partial satisfaction of the allowed secured claim, thereby reducing the monthly payments due under the terms of this paragraph accordingly.

Please see Exhibit "2" for amount of projected monthly payments based on projected claim as of |

| | | | January 1, 2011, which accounts for adequate protection payments through December 2010. |
| --- | --- | --- | --- |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
| --- | --- | --- | --- |
| 17 | McDaris shall have an allowed secured claim against the Debtors in the amount as listed on page 18 of this Disclosure Statement as of November 1, 2010, and reduced by any adequate protection payments and Payoff Amounts made before the Effective Date. | Impaired; allowed claim in this class is entitled to vote on the Plan. | Commencing on February 28, 2011, the Debtors shall repay McDaris' allowed secured claim, less any amounts identified above, and together with interest accruing on any unpaid portion thereof, over a sixty-month term, with: (i) the Debtors' monthly principal and interest payments in months 1 through 59 calculated on a 108-month amortization schedule and (ii) the Debtors' monthly payment in month 60 equal to the remaining balance due and owing to McDaris under the allowed secured claim, plus all interest accrued through the date of payoff. After March 1, 2011, interest shall accrue on any unpaid portion of the allowed secured claim at a rate of 5.0 % per annum, and, upon the sale, retirement, or other final disposition of any item of McDaris' collateral, the Debtors shall be obligated to pay McDaris the outstanding balance that remains due on that item of collateral, and McDaris shall apply that payoff amount as a partial satisfaction of the allowed secured claim, thereby reducing the monthly payments due under the terms of this paragraph accordingly. Please see Exhibit "2" for amount of projected monthly payments based on projected claim as of January 1, 2011, which accounts |

| | | | for adequate protection payments through December 2010. |
|---|---|---|---|

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 18 | Class 18 claim holders are comprised of any other secured claims which exist other than those contained in any other class. As described above, the Debtors have not included any such other secured claims in their bankruptcy schedules. The Debtors will be objecting to any and all secured claims asserted by creditors in proofs of claim that are categorized or would be categorized in class 18. | Impaired; allowed claims in this class are entitled to vote on the Plan. | In full settlement and satisfaction of all class 18 claims, each holder of a class 18 allowed claim will be treated in a manner consistent with the provisions of Section 1129(b)(2)(A)(iii) of the Bankruptcy Code (i.e., the holders of such claim will realize the indubitable equivalent of their secured claims). None of the class 18 claims shall attach to any of the Debtors property or rents or proceeds thereof, and all class 18 claims shall be deemed extinguished on the Effective Date.<br><br>Notice of the Plan and class 18 treatment having been served on (i) all parties with valid UCC filings against the Debtors as of the CL Petition Date for CL and the Petition Date for CMS and MAX, (ii) all scheduled creditors, (iii) all parties that filed proofs of claim, and (iv) all parties requesting special notice, all class 18 claim holders are deemed to have notice and all liens and claims against the Debtors are extinguished irrevocably on the Effective Date. |

(ii) Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Bankruptcy Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows: the Bankruptcy Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim. However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claim. There are three (3) scheduled non-tax priority claims on MAX's schedules and proofs of claim. They will be paid in full out of cash on hand on the later of (i) the Plan Effective Date and (ii) the date the Court enters an order allowing such priority claims, unless such class 19 allowed claims can be satisfied in an alternative manner acceptable to the holders of the class 19 allowed claims.

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| 19 | Priority wage claims under 11 U.S.C. § 507(a)(4) for the wages, salaries or commissions, including vacation, severance, and sick leave pay or sales commission earned within 180 days of the Petition Date, not to exceed $10,950.00 per person.<br><br>Class comprised of three individuals: Dennis Kenkellan, Mason Bailey, and Robert McDaris.<br><br>Total: $ 9,670.25 | No. Not entitled to vote on Plan. | Class 19 allowed claims will be paid in full by the Reorganized Debtor on the Effective Date. |

(iii)    Class of General Unsecured Claims

General unsecured claims are unsecured claims not entitled to priority under Bankruptcy Code Section 507(a).  Several claims were filed against each of the Debtors where the claim was already scheduled with a different Debtor. These proofs of claim are marked in Exhibit "3" by an "M" for MAX, a "CL" for CL, and a "CMS" for CMS" next to the claim number to indicate against which debtor the proof of claim was filed, but they are listed on the Debtors' claim chart to correspond with the scheduled claims.  To the extent that the proofs of claim against one debtor duplicates claims scheduled against another debtor, the Plan eliminates any such duplication.  The following chart identifies the Plan's treatment of the class containing all of the Debtors' non-priority general unsecured claims (see the claims chart attached as Exhibit "3" to this Disclosure Statement for detailed information about each general unsecured claim):

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 20 | All general unsecured claims of the Debtors which are not included in any other class.<br><br>Total amount of class 20 claims amongst all three Debtors is $473,460.03, which figure excludes inter-company debt of $3,147,349.54 owed by CMS and $358,153.60 owed by MAX.<br><br>A detailed claims chart showing all claims which were scheduled by the Debtors and all proofs of claim which have been filed against the Debtors (separated out between CL, CMS, and MAX) is attached hereto as Exhibit "3" (the "Claims Chart"). The Chart indicates to which claims the Debtors will object. The Debtors estimate that after the objection to claims process has been completed and certain claims in relation to leases are paid in the cure and assumption process | Impaired; allowed claims in this class are entitled to vote on the Plan. | Each holder of a class 20 allowed claim will receive in full settlement and satisfaction of its class 20 allowed claim a cash payment on June 30, 2011 equal to 7.5% of the amount of its class 20 allowed claim and then a second cash payment on September 30, 2011 equal to 7.5% of the amount of its class 20 allowed claim, for a total payment of 15% of its class 20 allowed claim. The Debtors propose to defer payment to class 20 to quarter 2 and quarter 3 of 2011 because quarter 1 is traditionally the slowest quarter in the construction industry in Southern California due to incremental weather and construction budgets.<br><br>Attached as Exhibit "3" to this Disclosure Statement is a listing of the name and dollar amount of the class 20 allowed claims against CL, CMS, and MAX expected to be paid by the Reorganized Debtor pursuant to the terms of the Plan.<br><br>Conditioned upon the confirmation of this Plan and the occurrence of the Plan Effective Date, CL, CMS, and MAX agree to waive all of their intercompany unsecured claims against each other. |

| | | |
|---|---|---|
| of 11 U.S.C. § 365, there will likely be a **TOTAL of approximately $369,474.88** of allowed general unsecured claims.<br><br>Several claims were filed against each of the Debtors where the claim was already scheduled with a different Debtor. These proofs of claim are marked by an "M" for MAX, a "CL" for CL, and a "CMS" for CMS" next to the claim number to indicate against which debtor the proof of claim was filed, but they are listed on the Debtors' claim chart to correspond with the scheduled claims. | | |

(iv)    Class of Interest Holders

Interest holders are the parties who hold an ownership interest (i.e., equity interest) in the Debtors.  The following chart identifies the Plan's treatment of the class of interest holders:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 21 | Mason Bailey, who owns 80% of the equity interests in each of the Debtors. | Not Impaired; Mason Bailey is not entitled to vote on the Plan because he is not impaired. | Mason Bailey will own 80% of the equity interests in the Reorganized Debtor. As described above, Mason Bailey will be making the New Value Contribution. |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| 22 | Robert McDaris, who owns 20% of the equity interests in each of the Debtors. | Not Impaired; Robert McDaris is not entitled to vote on the Plan because he is not impaired. | Robert McDaris will own 20% of the equity interests in the Reorganized Debtor. As described above, Robert McDaris will be making the New Value Contribution. |

d.      **Means of Effectuating the Plan and Implementation of the Plan**

      **1.      Funding for the Plan**

The Plan will be funded from three primary sources consisting of (i) the New Value Contribution to be contributed by Bailey and McDaris to the Reorganized Debtor on the Plan Effective Date; (ii) the Debtors' cash on hand as of the Plan Effective Date; and (iii) from the positive cash flow generated by the business operations of the Reorganized Debtor.

The New Value Contribution will be in amount of $50,000.00, which may be adjusted as necessary, to assist the Reorganized Debtor to pay the outstanding professional fees and expenses owing by the Debtors, plus whatever additional sum is needed to enable the Reorganized Debtor to fund the Class 20 payments under the Plan.  If the $50,000.00 portion of the New Value Contribution is not sufficient to enable the Reorganized Debtor to pay the full amount of the outstanding professional fees and expenses owing by the Debtors, the New Value Contribution will be increased by whatever amount is needed to enable the Reorganized Debtor to pay the full amount of the outstanding professional fees and expenses owing by the Debtors unless a mutually acceptable alternative arrangement is reached between the Reorganized Debtor and the respective professionals.  The New Value Contribution may be otherwise adjusted as necessary for effectuating the Plan.

Furthermore, adequate protection payments to the Secured Lenders will cease as of the Plan Effective Date, allowing the Reorganized Debtor to build a cash reserve during the first

two months of 2011 before making the first Plan payments to secured and unsecured creditors at the end of February 2011, except for GECC, GECDF, and WFEFI, which will receive payment commencing at the end of January 2011.

### 2.    Composition of the Reorganized Debtor

On the Plan Effective Date, CL and MAX will be deemed substantively consolidated with CMS, with the post-confirmation substantively consolidated entity to be referred to herein as the "Reorganized Debtor." The Reorganized Debtor will acquire all assets and assume all liabilities of CL, CMS, and MAX, as restructured under the Plan. The Reorganized Debtor will sign any reasonable documentation as requested by creditors or required by law to effectuate the acquisition of assets and assumption of liabilities under the Plan. CL and MAX will be deemed dissolved by and through an order of this Court confirming the Plan. Additionally, the Debtors will take appropriate steps in accordance with the California Corporate Code and applicable non-bankruptcy law to dissolve CL and MAX, such as filing Limited Liability Company Certificate of Cancellation Form LLC 4/7 with the State of California Secretary of State within ten (10) business days of the Plan Effective Date, thereby leaving CMS as the surviving Reorganized Debtor with all assets and liabilities of the three Debtors under the confirmed Plan. Bailey will own 80% and McDaris will own 20% of the equity interests of the Reorganized Debtor, consistent with their current respective 80% and 20% ownership in each of the three Debtors.

### 3.    Post-Confirmation Management

Mason Bailey will continue as the managing manager of the Reorganized Debtor. Bailey has served as the Debtors' managing manger since their formation in 2000. Bailey has a masters of business administration from the University Of Chicago School Of Business and ten years of experience in the construction equipment rental industry. Bailey's initial compensation

will remain the same as it currently is, which consists of a base salary of $107,500 per year plus usual and customary benefits and reimbursement of expenses.

Robert McDaris will continue as the managing manager of the Reorganized Debtor. McDaris has served as the Debtors' managing manger since their formation in 2000. McDaris has over thirty years of experience in the construction equipment rental industry. McDaris' initial compensation will remain the same as it currently is which consists of a base salary of $107,500 per year plus usual and customary benefits and reimbursement of expenses.

### 4. Disbursing Agents

The Reorganized Debtor will serve as the disbursing agent for purposes of making all distributions required to be made under the Plan. The Reorganized Debtor will not charge any disbursing agent fee for making such distributions.

### 5. Objections to Claims

The Debtors or the Reorganized Debtor, as the case may be, will file objections to all claims which are inconsistent with the Debtors' books and records unless the Debtors deem the inconsistency to be insignificant. With respect to disputed claims that are not resolved prior to the Plan Effective Date, the Reorganized Debtor will have the authority, in its sole discretion, in the reasonable exercise of its business judgment, to settle or compromise any disputed claim without further notice or Court approval. As provided by Section 502(c) of the Bankruptcy Code, the Court may estimate any contingent or unliquidated disputed claim for purposes of confirmation of the Plan. The Debtors or the Reorganized Debtor, as the case may be, will have the authority to file any objections to claims following the confirmation of the Plan, and the Court shall retain jurisdiction over the Debtors, the Reorganized Debtor and these cases to resolve such objections to claims following the confirmation of the Plan. Nothing contained in the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtor of any rights of setoff or recoupment, or of any defense, the Debtors or the Reorganized Debtor may

have with respect to any claim.  The deadline for filing claims objections shall be 180 days after the Plan Effective Date.

### 6.    Avoidance Actions

The Debtors have not performed a detailed analysis of payments made during the ninety-day preference period for non-insiders, but are not aware of any such payments that would be clearly avoidable as preference payments, as the Debtors believe that all such payments would be subject to some form of ordinary course, contemporaneous exchange or new value defense. A copy of the schedule of the Debtors' payments made during the ninety-day preference period for non-insiders is attached hereto as Exhibit "4".  The Debtors also are not aware of any fraudulent conveyances which have occurred and which need to be avoided with respect to non-insiders.  A copy of the schedule of the Debtors' payments made during the one-year preference period for insiders is attached hereto as Exhibit "5".  The rights of these estates with respect to any preferences or fraudulent conveyances to insiders of the Debtors will, on the Plan Effective Date, be deemed assigned to the Reorganized Debtor as the representative of the Debtors' estates under section 1123(b) of the Bankruptcy Code.  However, any professional fees and expenses incurred in the pursuit of avoidance causes of action may be paid solely from the recovery from the pursuit of such avoidance causes of action.  All claims, causes of action and avoidance actions of the Debtors and their estates with regard to insider transactions are preserved by the Plan, and the Reorganized Debtor shall have full power and authority to settle, adjust, retain, enforce or abandon any claim, cause of action or avoidance actions as the representative of the Debtors' estates under section 1123(b) of the Bankruptcy Code or otherwise, regardless of whether such claims, causes of action or avoidance actions were commenced prior or subsequent to the Plan Effective Date.

/ / /

/ / /

**7.     Employment of Professionals by the Reorganized Debtor and Payment of Professional Fees and Expenses Incurred after the Effective Date**

On and after the Effective Date, the Reorganized Debtor shall have the right to employ and compensate professionals as the Reorganized Debtor determines  is appropriate and to compensate any such professionals without the need for any further order of the Court.

**8.     Post-Confirmation Committee**

The members of the Committee shall have the right, but not the obligation, to form a post-confirmation committee (the "Post-Confirmation Committee") for the purposes of insuring the Reorganized Debtor's compliance with their obligations under the Plan.   The Post-Confirmation Committee shall have the right to employ professionals to represent the interests of the Post-Confirmation Committee, with the reasonable fees and expenses of such professionals to be paid by the Reorganized Debtor, not to exceed $5,000 per year, until such time as all Plan obligations to the holders of class 20 allowed claims have been satisfied.

**9.     Exemption from Transfer Taxes**

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of the Bankruptcy Code, may not be taxed under any law imposing a stamp tax or similar tax.  Transfers under the Plan that are exempt from taxes under section 1146(c) of the Bankruptcy Code include all transfers by the Debtors after the commencement of their chapter 11 cases in contemplation of the Plan but prior to the Effective Date.  The taxes from which such transfers are exempt include stamp taxes, recording taxes, sales and use taxes, transfer taxes, and other similar taxes.

**10.     Distributions to Be Made Pursuant to the Plan**

Except as otherwise agreed to by the Reorganized Debtor in writing, distributions to be made to holders of allowed claims pursuant to the Plan may be delivered by regular mail,

postage prepaid, to the address shown in the Debtors' schedules, as they may from time to time

be amended in accordance with Bankruptcy Rule 1000, or, if a different address is stated in a

proof of claim duly filed with the Bankruptcy Court, to such address.  Checks issued to pay

allowed claims shall be null and void if not negotiated within sixty (60) days after the date of

issuance thereof.

### 11.    Exculpations and Releases

To the maximum extent permitted by law, neither the Debtors, the Reorganized Debtor,

nor the Committee, nor any of their employees, officers, directors, shareholders, agents,

members, representatives, or professionals employed or retained by any of them, whether or not

by Bankruptcy Court order, shall have or incur liability to any person or entity for any act taken

or omission made in good faith in connection with or related to the formulation and

implementation of the Plan, or a contract, instrument, release, or other agreement or document

created in connection therewith, the solicitation of acceptances for or confirmation of the Plan,

or the consummation and implementation of the Plan and the transactions contemplated therein.

### 12.    Injunctions

The Plan Confirmation Order shall enjoin the prosecution, whether directly, derivatively

or otherwise, of any claim, obligation, suit, judgment, damage, demand, debt, right, cause of

action, liability or interest against the Debtors, the Reorganized Debtor, or their property that is

released, discharged or terminated pursuant to the Plan.  Except as provided in the Plan or the

Plan Confirmation Order, as of the Effective Date, all entities that have held, currently hold or

may hold a claim or other debt or liability that is discharged or an interest or other right of an

equity security holder that is extinguished pursuant to the terms of the Plan are permanently

enjoined from taking any of the following actions against the Debtors, the Reorganized Debtor,

or their property on account of any such discharged claims, debts or liabilities or extinguished

interests or rights: (i) commencing or continuing, in any manner or in any place, any action or

other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors; and (v) commencing or continuing any action in any manner, in any place, that does not comply with or is inconsistent with the provisions of the Plan.  By accepting distributions pursuant to the Plan, each holder of an allowed claim receiving distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in this Section.  The Plan Confirmation Order shall not enjoin creditors from enforcing personal guaranties executed in connection with any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or interest against the Debtors or the Reorganized Debtor.

### 13.    Executory Contracts and Unexpired Leases

On the Effective Date, all of the Debtors' remaining executory contracts and unexpired leases which have not previously been assumed or rejected by the Debtors and which are identified in Exhibit "6" hereto shall be deemed to be assumed by the Debtors and to become valid and binding executory contracts and unexpired leases of the Reorganized Debtor (the "Debtors' Assumed Contracts and Leases").  By 5:00 p.m. PST on the day prior to the date of the Plan confirmation hearing, the Debtors shall file a pleading with the Court identifying all of the Debtors' Assumed Contracts and Leases.  All of the Debtors' remaining executory contracts and unexpired leases that have not previously been assumed or rejected by the Debtors and that are not included among the Debtors' Assumed Contracts and Leases shall be deemed rejected effective as of 11:59 PST on the Plan Effective Date.  With respect to all of the Debtors' Assumed Contracts and Leases for which a default exists on the Plan Effective Date, the Debtors will be required to (a) cure or provide adequate assurance that the Reorganized Debtor will promptly cure any default existing under any such executory contracts and unexpired

leases, (b) compensate or provide adequate assurance that the Reorganized Debtor will promptly compensate any other party to such executory contracts and unexpired leases for any actual pecuniary loss to such parties resulting from any default existing under any such executory contracts and unexpired leases, and (c) provide adequate assurance of future performance under such executory contracts and unexpired leases. **THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF AN UNEXPIRED LEASE OR EXECUTORY CONTRACT WHICH IS REJECTED ON THE PLAN EFFECTIVE DATE WILL BE THIRTY DAYS AFTER THE PLAN EFFECTIVE DATE.** Any claim based on the rejection of an unexpired lease or executory contract will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

**14.   Changes in Rates Subject to Regulatory Commission Approval**

The Debtors are not subject to governmental regulatory commission approval of their rates.

**15.   Retention of Jurisdiction**

After confirmation of the Plan and occurrence of the Plan Effective Date, in addition to jurisdiction which exists in any other court, the Court will retain such jurisdiction as is legally permissible including for the following purposes:

i.   To resolve any and all disputes regarding the operation and interpretation of the Plan and the Plan Confirmation Order;

ii.   To determine the allowability, classification, or priority of claims and interests upon objection by the Debtors, the Reorganized Debtor, the Committee or by other parties in interest with standing to bring such objection or proceeding and to consider any objection to claim or interest whether such objection is filed before or after the Effective Date;

iii.   To determine the extent, validity and priority of any lien asserted against property of the Debtors and property of the Debtors' estates;

iv.    To construe and take any action to enforce the Plan, the Plan Confirmation Order, and any other order of the Court, issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan, the Plan Confirmation Order, and all matters referred to in the Plan and the Plan Confirmation Order, and to determine all matters that may be pending before the Court in these cases on or before the Effective Date with respect to any person or entity related thereto;

v.    To determine any and all applications for allowance of compensation and reimbursement of expenses of professionals for the period on or before the Effective Date;

vi.    To determine any request for payment of administrative expenses;

vii.    To determine motions for the rejection, assumption, or assignment of executory contracts or unexpired leases filed before the Effective Date and the allowance of any claims resulting therefrom;

viii.    To determine all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted during the pendency of this case whether before, on, or after the Effective Date including avoidance causes of action, and the Reorganized Debtor shall have the right to commence any avoidance causes of action after the Effective Date and to continue with the prosecution of any avoidance causes of action commenced by the Debtors prior to the Effective Date;

ix.    To determine such other matters and for such other purposes as may be provided in the Plan Confirmation Order;

x.    To modify the Plan under Section 1127 of the Bankruptcy Code in order to remedy any apparent defect or omission in the Plan or to reconcile any inconsistency in the Plan so as to carry out its intent and purpose;

xi.    Except as otherwise provided in the Plan and the Plan Confirmation Order, to issue injunctions, to take such other actions or make such other orders as may be

-48-

necessary or appropriate to restrain interference with the Plan or the Plan Confirmation Order, or the execution or implementation by any person or entity of the Plan or the Plan Confirmation Order;

xii.    To issue such orders in aid of consummation of the Plan and the Plan Confirmation Order, notwithstanding any otherwise applicable nonbankruptcy law, with respect to any person or entity, to the fullest extent authorized by the Bankruptcy Code or Bankruptcy Rules; and

xiii.    To enter a final decree closing these chapter 11 cases.

## IV.

## EFFECT OF CONFIRMATION OF THE PLAN

a.    **Discharge.**

The Debtors will receive a discharge under the Plan pursuant to and in accordance with the provisions of Section 1141 of the Bankruptcy Code because there has not been a liquidation of all or substantially all of the property of the Debtors' estates and because the Reorganized Debtors will be continuing with the Debtors' current business operations.

b.    **Modification of the Plan.**

The Debtors may modify the Plan at any time before confirmation.  However, the Court may require a new disclosure statement and/or re-voting on the Plan if the Debtors modify the Plan before confirmation.  The Debtors may also seek to modify the Plan at any time after confirmation of the Plan so long as (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

/ / /

/ / /

/ / /

c.    **Post-Confirmation Status Reports.**

As described above, until a final decree closing the Debtors' chapter 11 cases is entered, the Reorganized Debtors will file quarterly post-confirmation status reports with the Court explaining what progress has been made toward consummation of the confirmed Plan.

d.    **Post-Confirmation Conversion/Dismissal.**

A creditor or any other party in interest may bring a motion to convert or dismiss these cases under Section 1112(b) of the Bankruptcy Code after the Plan is confirmed if there is a default in performing the Plan.  If the Court orders the cases converted to chapter 7 after the Plan is confirmed, then all property that had been property of the Debtors' chapter 11 estates, and that has not been disbursed pursuant to the Plan, will revest in the chapter 7 estates, and the automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during these cases.  The Plan Confirmation Order may also be revoked under very limited circumstances.  The Court may revoke the Plan Confirmation Order if it was procured by fraud and if a party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the Plan Confirmation Order.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

e.    **Final Decree.**

Once these estates have been fully administered as referred to in Bankruptcy Rule 3022, the Reorganized Debtor will file a motion with the Court to obtain a final decree to close these cases.  The Reorganized Debtors will be responsible for the timely payment of all fees incurred pursuant to 28 U.S.C. § 1930(a)(6).

Dated: November 29, 2010 *[changes made 1/13/2011]*

Presented By:

LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.


By:___*/s/ Ron Bender*_____
        RON BENDER
        JOHN-PATRICK M. FRITZ
        Attorneys for Chapter 11
        Debtors and Plan Proponents


Construction Labor, LLC
Construction Machine Services, LLC
Max Equipment Rental, LLC


By:___*/s/ Mason Bailey*_____
        Mason Bailey
        Managing Manager

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**EXHIBIT "2"**
**[Please see docket entry no. 275]**

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**ADDENDUM "W"**

27

28

**Amended and Restated Loan and
Security Agreement**

Wells Fargo Equipment Finance, Inc.
733 Marquette Avenue, Suite 700
Minneapolis, Minnesota 55402

Construction Machine Services, LLC
2365 Oceanside Blvd.
Oceanside, California 92054

**Notice:  Secured Party reserves the right to withdraw the terms of this Agreement and
issue a modified Agreement without notice to Debtor if Secured Party is not in receipt of a
fully executed original or facsimile of this document within five (5) business days of the
date of this Agreement.  However, in that event, no such modifications will be binding on
Debtor unless and until Debtor executes the modified document containing all such
modifications.**

   This AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT
(the "Agreement") is entered into as of January 12, 2011 between CONSTRUCTION
MACHINE SERVICES, LLC, a California limited liability company ("Debtor") and WELLS
FARGO EQUIPMENT FINANCE, INC. ("Secured Party"), a Minnesota Corporation, successor
in interest to The CIT Group/Equipment Financing, Inc. ("CIT").

<u>**Factual Background**</u>

   WHEREAS, Construction Labor, LLC ("CL") filed a voluntary petition under
chapter 11 of title 11 sections 101 *et seq.* of the United States Code (the "Bankruptcy Code") on
December 16, 2009.

   WHEREAS, Construction Machine Services, LLC ("CMS") and Max Equipment
Rental ("MAX" and collectively with CMS and CL, the "Debtors") filed their voluntary petitions
under chapter 11 of the Bankruptcy Code on January 12, 2010.

   WHEREAS, the Debtors have proposed a plan of reorganization that provides that
the Debtors will be substantively consolidated and merged into a single reorganized debtor (the
"Reorganized Debtor"), which will be CMS, and all of the Debtors' assets will be owned by CMS
and all of the Debtors' liabilities as restructured under the plan will be assumed by CMS on the
plan effective date.

   WHEREAS, prior to commencement of the above-referenced bankruptcy cases,
the Debtors and Secured Party, as successor in interest to CIT, were parties to certain agreements
(the "Prior Agreements") providing and securing certain equipment financing, including, but not
limited to:

   (a)  A *Master Security Agreement*, dated August 24, 2000, between Max and
      CIT (the "Max Security Agreement").

(b)      A *Master Security Agreement*, dated November 21, 2006, between CL and CIT (the "CL Security Agreement").

(c)      A *Guaranty*, dated November 21, 2006, executed by Mason Bailey ("<u>Mr. Bailey</u>") and Robert McDaris ("<u>Mr. McDaris</u>") as individual guarantors, and CMS as corporate guarantor, pursuant to which Mr. Bailey, Mr. McDaris, and CMS guaranteed the obligations of CL to CIT.

(d)      An *Addendum to Guaranty dated November 21, 2006 of Construction Labor, LLC. ("Lessee") by Construction Machine Services, LLC. ("Guarantor")*, executed by CL, CMS, and CIT.

(e)      A *Covenant Rider to Corporate Guaranty Agreement dated November 21, 2006 between The CIT Group/Equipment Financing, Inc. ("CIT") as Secured Party and Construction Machine Services, LLC as Guarantor*, executed by CMS and CIT.

(f)      A *Fleet Rental Rider to Master Security Agreement* dated November 21, 2006 between CL and CIT.

(g)      A *Master Loan and Security Agreement*, dated May 27, 2008, between CL and Secured Party (the "CL Loan Agreement" and collectively with the Max Security Agreement and the CL Security Agreement, the "Prior Loan and Security Agreements").

(h)      An *Amendment*, dated August 31, 2009, between CL and Secured Party.

WHEREAS, pursuant to the terms of the Prior Agreements, the Debtors and CIT or the Debtors and Secured Party entered into certain Schedules (the "Schedules," and together with the Prior Agreements, the "<u>Prior Documentation</u>") relating to the purchase of certain pieces of equipment, each of which is more fully described on **Schedule A** hereto.

WHEREAS, the Debtors have requested a modification of the Prior Documentation in connection with the Debtors' plan of reorganization (the "Plan").

WHEREAS, the Debtors are indebted to Secured Party in an amount in excess of $2,426,832.62 under the terms of the Prior Documentation.

WHEREAS, pursuant to the Plan, Debtor and Secured Party have agreed that the aggregate outstanding amount owed to Secured Party under the Prior Documentation is $2,426,832.62 as of October 31, 2010.

## Agreement

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

1.     **Loan and Payment Schedule**.  Secured Party shall have an allowed secured claim in the amount of $2,403,230.96.  For value received, Debtor hereby promises to pay to the order of Secured Party at its main office in Minneapolis, Minnesota in lawful money of the United States of America the principal sum of $2,403,230.96, together with interest on the unpaid balance hereof at the rate of **5.00%** per annum (computed on the basis of a year of twelve 30-day months).  Effective January 28, 2011, Debtor shall pay Secured Party certain payments as follows:

1.     On January 31, 2011, accrued interest for the month of January, 2011 will be paid by the Debtor to Secured Party.

2.     Commencing on February 28, 2011 and on the last calendar day of each month thereafter until and including July 31, 2012, the Debtor shall pay Secured Party monthly installments of principal and interest in amount of $28,000.

3.     Commencing on August 31, 2012 and on the last calendar day of each month thereafter until and including January 31, 2013, the Debtor shall pay Secured Party monthly installments of principal and interest in amount of $34,500.00.

4.     Commencing on February 28, 2014 and on the last calendar day of each month thereafter until and including January 31, 2016, the Debtor shall pay Secured Party monthly installments of principal and interest in amount of $50,000.

5.     On February 29, 2016 (the "Balloon Payment Date"), the Debtor shall pay Secured Party any balance owing, all accrued and unpaid interest, charges, fees and costs.   Not less than 120 days prior to the Balloon Payment Date, the Debtor shall request in writing a full and final accounting of any and all amounts still due and owing to Secured Party.  Secured Party shall provide the accounting to the Debtor not later than 25 days prior to the Balloon Payment Date.

6.     In consideration of Secured Party's agreement to reduce to the principal amount owed by the Debtor under the Prior Documentation, the Debtor agrees to make a $30,000 payment to Secured Party on March 31, 2016 (the "Supplemental Payment").  Secured Party agrees to waive the Debtor's obligation to make the Supplemental Payment if all payments due and owing under the terms of this Agreement have been made on or prior to their scheduled due date, or if the principal is prepaid in full and all previous payments due and owing under the terms of this Agreement have been made on or prior to their scheduled due date.

2.     **Default Rate and Late Charges.**  Notwithstanding anything contained herein to the contrary, during the continuance of any Event of Default, the Obligations (including, to the extent permitted by law, interest not paid when due) shall bear interest at per annum rate of 2%

plus the interest rate otherwise applicable thereto (whether before or after any judgment).  If any installment due hereunder is not paid when due, Secured Party may impose a late charge of up to 5% of the amount of the installment but in any event not more than permitted by applicable law.

3.    **Prepayments.**

a.    This Loan may be prepaid in whole at any time by paying to Secured Party the unpaid principal balance of this Loan determined by using the simple interest method at the rate set forth herein, together with accrued but unpaid interest and late charges.

b.    This Loan may be prepaid in part but only as a result of a disposition of an item of collateral which secures this Loan.  The amount of such partial prepayment relative to an item of collateral shall be equal to a principal amount for the prepaid item as reasonably determined in Secured Party's reasonable discretion, together with accrued but unpaid interest.  **Nothing contained in this paragraph shall be construed as an authorization by Secured Party to the undersigned to Sell or otherwise dispose of an item of collateral which secures this Loan.**  Such sale or disposition of an item of collateral by the undersigned shall be made solely in accordance with the terms of this security agreement or other agreement pursuant to which the undersigned pledged such item of collateral to Secured Party.  Prepayments made pursuant to this paragraph 3(b) shall be applied to reduce future principal installments in such manner and order as Secured Party may determine in its reasonable discretion.

c.    Commencing with the calendar year ending December 31, 2011, Debtor shall prepay the Loan on or before April 30 of each calendar year (with first payment due on or before April 30, 2012) in an amount equal to 25% of the Debtor's net income for the most recently ended fiscal year, as reported by Debtor in the financial statements delivered in accordance with paragraph 6(o).  Calculations of net income shall be made in accordance with generally accepted accounting principles.  Prepayments made in accordance with this paragraph 3(c) shall be applied to principal installments in inverse order of maturity.

4.    **Definitions**.  The following terms have the following meanings in this Agreement:

"Equipment" means the equipment described on **Schedule A** of this Agreement, together with all accessories, attachments, parts, repairs, additions, and replacements attached thereto or incorporated therein.  After Debtor signs this Agreement, Debtor authorizes Secured Party to insert any missing information or change any inaccurate information (such as the model year of the Equipment or its serial number or VIN) into the Equipment description on Schedule A, after consultation with the Debtor.

"Guarantor" means any guarantor of the Loan.

"Loan" means the loan evidenced by paragraph 1 of this Agreement.

"Obligations" means the Loan (along with any amendments, extensions or modifications thereto) and all other obligations of Debtor to Secured Party under this Agreement or any other agreements entered into in connection with this Agreement.

5.    **Security Interest**.  To secure payment of the Obligations, Debtor hereby grants Secured Party a security interest in the Equipment and in the proceeds thereof.

6.    **Representations and Agreements**.  Debtor hereby represents and agrees as follows:

a.    **Authorization**.  (i) if Debtor is a partnership, corporation, limited liability company or other legal entity the execution and delivery of this Agreement and the performance of Debtor's obligations hereunder have been duly authorized by all necessary action on the part of the Debtor; (ii) the person signing on behalf of Debtor is duly authorized; (iii) all information provided by Debtor to Secured Party in connection with this Agreement is true and correct; and (iv) this Agreement constitutes a legal, valid and binding obligation of Debtor, enforceable against Debtor in accordance with its terms.

b.    **Business Location; Name**.  Debtor shall not change its name or business address from that set forth above and, if an individual shall not change the state of residence, and, if not an individual, shall not change the state of organization, unless it shall have given Secured Party or its assigns no less than thirty (30) days' prior written notice thereof.

c.    **Business Purpose; Lawful Use**.  The Equipment will be used primarily for business purposes as opposed to personal, family or household purposes.  Debtor will comply with all laws and regulations applicable to the Equipment and its use.

d.    **Clear Title**.  Debtor has good and marketable title to the Equipment free and clear of all security interests, liens, and other encumbrances and rights, and of all claims of co-ownership by others, with the exception of liens held by Secured Party.

e.    **No Sales or Junior Liens**.  Debtor will not sell, transfer, lease (other than in the ordinary course of business), grant a security interest in, or otherwise encumber the Equipment except for the security interest granted hereunder without the prior written consent of Secured Party in its sole discretion absent express prior written consent of Secured Party, which consent shall be given in Secured Party's sole discretion.

f.    **Equipment Delivery**.  Debtor hereby represents that the Equipment has been delivered to and accepted by the Debtor and is in all respects satisfactory to Debtor (a) on the date of this Agreement or (b) on the date shown on a separately signed Delivery and Acceptance certificate.

g.    **Equipment Location**.  Other than in the ordinary course of its business, Debtor will not part with possession or control of or suffer or allow to pass out of its

possession or control any Equipment or change the location of the Equipment or any part thereof from the Equipment Location shown above unless the Equipment is rolling stock.

h.    **Maintenance**.  Debtor will maintain the Equipment in good repair, condition and working order and will furnish all parts and services required therefor, all at its expense, ordinary wear and tear excepted.

i.    **Taxes**.  Debtor will pay all personal property, sales, use, and other taxes levied on or assessed against the Equipment before the date on which penalties attach thereto, except as provided in the Plan.

j.    **Equipment Personalty**.  The Equipment shall remain personal property regardless of its attachment to realty, and Debtor agrees to take such action at its expense as may be necessary to prevent any third party from acquiring any interest in the Equipment as a result of its attachment to realty.

k.    **Equipment Use**.  Debtor will use the Equipment with due care and only for purposes of which it is intended.  The Equipment shall not be used outside of the United States without Secured Party's prior written consent.

l.    **Casualty Insurance**.  Debtor will obtain and maintain physical damage insurance issued by responsible insurance companies insuring the Equipment against damage and loss in an amount not less than the full replacement value of the Equipment.  Debtor shall furnish Secured Party with a certificate of insurance evidencing the issuance of a policy to Debtor in at least the minimum amounts required herein naming Secured Party as loss payee for the property damage coverage.  Each such policy shall be in such form and with such insurers as may be satisfactory to Secured Party and each such policy shall contain a clause specifying that no action or misrepresentation by Debtor shall invalidate such policy, and a clause requiring the insurer to give Secured Party at least 10 days prior written notice of (i) the cancellation of such policy or (ii) any amendment to the terms of such policy if such amendment would cause the policy no longer to conform to the policy requirements stated in this paragraph.  Debtor shall advise Secured Patty in writing promptly of any loss or damage to the Equipment and of the circumstances and extent of such damage.  Any insurance or condemnation proceeds received shall be paid to Secured Party and credited to Debtor's Obligations.  Notwithstanding anything herein to the contrary, Debtor shall not be required to pay to Secured Party a prepayment premium on a prepayment hereunder that is due to a casualty to the Equipment provided Debtor provides Secured Party with proof of an insurance claim therefor.

m.    **Inspection Rights**.  Debtor will permit Secured Party to inspect the Equipment at any reasonable time and from time to time as Secured Party may reasonably request.

n.      **Further Assurances**.  Debtor will promptly execute and deliver to Secured Party such further documents and take such further action as Secured Party may request in order to carry out more effectively the intent and purpose of this Agreement, including the execution and delivery of appropriate financing statements to protect fully Secured Party's interest hereunder in accordance with the Uniform Commercial Code or other applicable law.  Secured Party and any assignee of Secured Party is authorized to file one or more Uniform Commercial Code financing statements containing a collateral description indentifying Secured Party's collateral without the signature of Debtor or signed by Secured Party or any assignee of Secured Party as attorney-in-fact for Debtor.  Debtor hereby grants to Secured Party a power of attorney in Debtor's name, to apply for a certificate of title for any item of Equipment that is required to be titled under the laws of any jurisdiction where the Equipment is or maybe used and/or to transfer title thereto upon the exercise by Secured Party of its remedies upon an Event of Default by Debtor under this Agreement.  Debtor will pay all costs of filing any financing, continuation or termination statements with respect to this Agreement including, without limitation, any documentary stamp taxes relating thereto.  Debtor will do whatever may be necessary to have a statement of interest of Secured Party and any assignee of Secured Party in the Equipment noted on any certificate of title relating to the Equipment and will deliver said certificate to Secured Party.  If Debtor fails to perform or comply with any of its agreements, Secured Party may perform or comply with such agreements in its own name or in Debtor's name as attorney-in-fact and the amount of any payments and expenses of Secured Party incurred in connection with such performance or compliance, together with interest thereon at the rate provided above, shall be deemed payable by Debtor upon demand.

o.      **Financial Statements**.

As soon as available, and in any event no later than 120 days after the end of each of Debtor's fiscal year, Debtor will furnish to Secured Party its annual financial statements, including, without limitation, a balance sheet and income statement, in form satisfactory to Secured Party.

As soon as available, and in any event no later than 45 days after the end of each of Debtor's fiscal quarters, Debtor will furnish its quarterly financial statements, including, without limitation, a balance sheet and income statement, in form satisfactory to Secured Party.

Such other financial information as Secured Party may reasonably request from time to time.

Any and all financial statements submitted and to be submitted to Secured Party have and will have been prepared on a basis of generally accepted accounting principles, and are and will be complete and correct and fairly present Debtor's financial condition as of the date of such financial statements.

7.      **Events of Default**.  The occurrence of any one of the following events will constitute an "Event of Default" hereunder:  (a) default on the payment, when due, of any payment of principal or interest on the Loan or default in the payment when due, of any of the other Obligations; (b) the breach of any one or more of the representations of Debtor hereunder or failure of Debtor to observe or perform any one or more of the agreements to be observed or performed by Debtor hereunder and in each case the continuance thereof for 10 business days following written notice thereof from Secured Party to Debtor; (c) the filing of a petition by or against Debtor or any Guarantor under the federal Bankruptcy Code naming Debtor or such Guarantor as Debtor; (d) appointment of a receiver of any part of the property of, assignment for the benefit of creditors by or the commencement of any proceeding under any state bankruptcy or insolvency law by or against Debtor or any Guarantor; (e) any financial or credit information submitted by or on behalf of Debtor or any Guarantor shall prove to have been false or misleading in any material respect when submitted; (f) an event of default shall occur under any indebtedness Debtor may now or hereafter owe to Secured Party or any affiliate of Secured Party; (g) any individual Debtor or individual Guarantor shall die; or (h) Debtor's consolidation with, merger into, or sale of all or substantially all of its assets to, any individual, corporation or other entity.

8.      **Remedies**.  Upon the occurrence of an Event of Default, and at any time thereafter, Secured Party may exercise, in its discretion, any one or more of the following rights and remedies: (a) Secured Party may declare the Loan and each other Obligation to be immediately due and payable, and the same shall thereupon be and become immediately due and payable in full without presentment, notice of dishonor or protest, all of which Debtor hereby waives; provided however, that upon the filing of a petition by or against Debtor under the federal Bankruptcy Code naming the Debtor as Debtor, the Loan and each other Obligation shall automatically be and become immediately due and payable in full without notice or demand of any kind, but with all rights of Debtor under title 11 of the United States Code reserved; (b) Secured Party may exercise any and all of the rights and remedies available to a Secured Party under the Uniform Commercial Code as in effect in the State of Minnesota, and in connection therewith, Debtor agrees at its expense to assemble the Equipment and make it available to Secured Party at a place or places to be designated by Secured Party in the continental United Stales reasonably convenient to both Secured Party and Debtor, and agrees that any notice of intended disposition of the Equipment required by law shall be deemed reasonable if such notice is given to Debtor in the manner provided in this Agreement at least 10 days before the date of such disposition; (c) Secured Party may recover from Debtor, and Debtor agrees to pay, the legal fees and expenses incurred by Secured Party in the exercise of any right or remedy available to it under this Agreement, including expenses of repossession, repair, storage, transportation, and disposition of the Equipment; and (d) Secured Party may exercise any and all other rights and remedies available to it by law or other agreement.

9.      **Release and Hold Harmless.**  Debtor hereby agrees as follows:

(a)      **Release**.  Debtor releases and exonerates Secured Party and each of its board members, partners, officers, directors, employees, insurers, attorneys, agents, representatives, shareholders, affiliates and successors in interest (collectively, the "Released Parties") from any and all claims, demands, actions, causes of action and liabilities which the Debtor may have against the Released Parties, or any of

them, as of the date hereof. Debtor acknowledges and intends that the Released Parties are being released from unknown and unforeseen claims to the fullest extent permitted by law and Debtor waives any defenses based thereon. Debtor expressly waives and relinquishes all rights and benefits that Debtor may have under any statute or other applicable law comparable to Section 1542 of the California Civil Code, which Section 1542 is intended to protect against an inadvertent release of unknown or unsuspected claims, and reads as follows:

**SECTION 1542. [GENERAL RELEASE; EXTENT.] A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

Debtor, being aware of said Section 1542, hereby expressly waives any rights Debtor may have under any statutes, other applicable law or common law principles of similar effect, with respect to the claims purported to be released hereby.

(b)     **Hold Harmless**. Debtor indemnifies and holds harmless the Released Parties, and agrees to defend the Released Parties (by counsel reasonably approved by Secured Party) from and against, all claims, demands, loss, liability, judgment, costs and expenses (including attorneys' fees and costs of suit) arising out of the Loan or the development, sale, leasing or operation of the Equipment.

10.     **Miscellaneous**.

a.      Secured Party shall not be deemed to have waived any of its rights hereunder unless such waiver be in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any right hereunder shall operate as a waiver of such right or any other right. A waiver on any one occasion hereunder shall not be construed as a bar to or waiver of any right or remedy on any future occasion.

b.      All rights and remedies of Secured Party shall be cumulative and may be exercised singularly or concurrently at Secured Party's option, and the exercise or enforcement of any one such right or remedy shall not bar or be a condition to the exercise or enforcement of any other.

c.      Any written notice hereunder to Debtor or Secured Party shall be deemed to have been given when delivered personally or deposited with a recognized overnight courier service or in the United States mails, postage prepaid, addressed to recipient at its address set forth above or at such other address as may be last known to sender and authorized by Debtor.

d.      Debtor shall keep accurate and complete records pertaining to Debtor's business and financial condition and submit to Secured Party such periodic reports

concerning Debtor's business and financial condition as Secured Party may from time to time reasonably request.

e.     This Agreement shall he construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of Minnesota without regard to conflicts of law rules.

f.     This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Debtor and Secured Party.

g.     If this Agreement is signed by more than one person as Debtor, then the term "Debtor" shall refer to each of them separately and to all of then jointly, and each such person shall be liable hereunder individually in full and jointly with the others.

h.     There shall be one original of the Agreement and it shall be marked "Original". To the extent that this Agreement constitutes chattel paper (as that term is defined by the Uniform Commercial Code), a security interest may be created only in the Agreement marked "Original".

i.     Notwithstanding anything to the contrary contained herein, if the rate of interest, late payment fee, prepayment premium or any other charges or fees due hereunder are determined by a court of competent jurisdiction to be usurious, then said interest rate, fees and/or charges shall be reduced to the maximum amount permissible under applicable law and any such excess amounts shall be applied towards the reduction of the principal balance of the Loan.

j.     Debtor may not assign or in any way dispose of all or any party of its rights or obligations under this Agreement or, other than in the ordinary course of its business, enter into any sublease of all or any part of the Equipment. Secured Party may assign its interest in this Agreement without notice to or the consent of the Debtor. Thereafter, such assignee shall have all the rights and benefits of Secured Party hereunder. Debtor will make all payments directly to such assignee. Debtor agrees to settle all claims, defenses, setoffs and counterclaims Debtor may have against Secured Party with Secured Party and will not set up any such claim, defense, setoff or counterclaim against assignee, and Secured Party agrees to remain responsible therefore.

k.     This Agreement may be modified only by a written instrument signed by Debtor.

l.     Any provision in this Agreement that is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability, without invalidating the remaining provisions of the Agreement, and any such unenforceability in any jurisdiction shall not render unenforceable such provision in any other jurisdiction.

m.      Paragraph headings are for convenience only, are not part of this Agreement and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

n.      Debtor hereby authorizes Secured Party to provide to the seller or manufacturer of the Equipment a copy of this Agreement, any other related document, and details pertaining to Debtor's account with Secured Party.

o.      Secured Party may in its sole discretion, accept a photocopy, electronically transmitted facsimile or other reproduction of this Agreement (a "Counterpart") as the binding and effective record of this Agreement whether or not an ink signed copy hereof is also received by Secured Party from Debtor, provided, however, that if Secured Party accepts a Counterpart as the binding and effective record hereof, the Counterpart acknowledged in writing above by Secured Party shall constitute the record hereof.  Debtor agrees that such Counterpart received by Secured Party shall, when acknowledged in writing by Secured Party, constitute an original document for the purposes of establishing the provisions thereof and shall be legally admissible under the best evidence rule and binding on and enforceable against Debtor.  If Secured Party accepts a Counterpart as the binding and effective record hereof only such Counterpart acknowledged in writing above by Secured Party shall be marked "Original" and to the extent that this Agreement constitutes chattel paper, a security interest may only be created in the Agreement that bears Secured Party's ink signed acknowledgement and is marked "Original."

p.      This Agreement amends and restates in their entirety (but without novation) the Prior Loan and Security Agreements.  To the extent the obligations under the Prior Loan and Security Agreements constitute purchase money obligations, the Obligations hereunder shall continue to constitute purchase money obligations.  To the extent the security interests granted under the Prior Loan and Security Agreements constitute purchase money security interests, the security interests granted hereunder shall continue to constitute purchase money security interests and shall be afforded the same priority and effect as the purchase money security interests granted under the Prior Loan and Security Agreements.

DEBTOR HEREBY WAIVES ANY RIGHT TO A JURY TRIAL WITH RESPECT TO ANY MATTER ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT.

[SIGNATURE PAGE FOLLOWS]

**Required Information**

Social Security Number _____; or Federal Tax I.D. Number__20-4660294_____

Date of Birth (Individual Debtors or Lessees only) _____

E-mail Address: masonbailey@maxequipment.com

Documentation Contact Name: Mason Bailey


Billing Address:        Construction Machine Services, LLC
                        Attn: Mason Bailey
                        2365 Oceanside Blvd
                        Oceanside, CA  92054

☐ The billing address stated above is correct.   ☐ Change the billing address as stated below.

Street _____ City_____

State _____ Zip Code _____

**U.S. Patriot Act Notice**.  To help the government fight the funding of terrorism and the money laundering activities, U.S. Federal law requires Secured Party to obtain, verify and record information that identifies each Debtor (individuals or businesses) who opens an account.  This information will include name, address and taxpayer identification number and may include other identifying documents.

        IN WITNESS WHEREOF the Debtor has signed this Agreement as of the date first above written.

                                        Receipt of this Amended and Restated Loan
                                        and Security Agreement is hereby
                                        acknowledged:

Construction Machine Services, LLC       Wells Fargo Equipment Finance, Inc.


_____        _____
By                                      By


_____        _____
Title                                   Title

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

**EXHIBIT "B"**

22

Exhibit "B" to this *Order Confirming Debtors' Second Amended Joint Plan of Reorganization*
*(Dated November 29, 2010)* includes, and is limited to, the personal property leases and
contracts between the Debtors and Penske Truck Leasing.  Specifically, Exhibit B hereto is
identical to Exhibit "6" to *Debtors' Submission of Exhibit "6" on Assumption of Unexpired*
*Leases and Executory Contracts in Connection with Debtors' Second Amended Joint Plan of*
*Reorganization (Dated November 29, 2010)* and is comprised of Exhibit "6A," the Penske
leases and contracts, and Exhibit "6B," the correspondence between the Debtors and Penske
reflecting their agreement on assumption of the leases and contracts.

23
24
25
26
27

[Please see Exhibit "6" to docket entry no. 274]

28

| In re:<br>CONSTRUCTION LABOR, LLC,<br><br>                                          Debtor(s). | CHAPTER  11<br>CASE NO  6:09-bk-40532-TD |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067

The foregoing document described as **Exhibit "2" To Order Confirming Debtors' Second Amended Joint Plan Of Reorganization (Dated November 29, 2010),** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **January 13, 2011** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☐  Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **January 13, 2011,** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed*
See attached service list via first class mail

☐  Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **January 13, 2011**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  *Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.*

**VIA IN-HOUSE ATTORNEY SERVICE**
Hon. Thomas Donovan
United States Bankruptcy Court
255 East Temple Street, Ctrm 1645
Los Angeles, California  90012          ☐  Service information continued on attached page
I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| January 13, 2011 | Jason Klassi | /s/ Jason Klassi |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                **F 9013-3.1**

| In re:<br>CONSTRUCTION LABOR, LLC,<br><br>                    Debtor(s). | CHAPTER  11<br>CASE NO  6:09-bk-40532-TD |
|---|---|

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled **ORDER CONFIRMING DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION (DATED NOVEMBER 29, 2010), AS MODIFIED** was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.  SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of **January 13, 2011**, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

- Ron Bender     rb@lnbrb.com
- Hall Brehme     crios@purdybrehme.com
- Daren Brinkman     office@brinkmanlaw.com
- Craig C Chiang     cchiang@buchalter.com
- John-patrick M Fritz     jpf@lnbrb.com
- Elizabeth A Lossing     elizabeth.lossing@usdoj.gov
- Randall P Mroczynski     randym@cookseylaw.com
- Mark D Poniatowski     ponlaw@ponlaw.com
- Laura J Portillo     office@brinkmanlaw.com
- Christopher O Rivas     crivas@reedsmith.com
- Martha E Romero     Romero@mromerolawfirm.com
- Kevin C Ronk     Kevin@brinkmanlaw.com
- Stephanie M Seidl     sseidl@sheppardmullin.com
- United States Trustee (RS)     ustpregion16.rs.ecf@usdoj.gov

☐    Service information continued on attached page

**II.  SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by U.S. Mail to the following person(s) and/or entity(ies) at the address(es) indicated below:

☐    Service information continued on attached page

**III.  TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s) and/or email address(es) indicated below:

☐ Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.
January 2009                                                                                           F 9021-1.1